IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR 10-23-BU-DWM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| CLAY ALLEN ROBERTS, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## I.  Introduction

On June 24, 2010, Montana Highway Patrol Trooper Brandon Moore (the

"Trooper" or "Trooper Moore") stopped Defendant Clay Allen Roberts'

("Roberts' ") vehicle near Logan, Montana.  The stop lasted approximately

eighteen minutes, and concluded with Roberts' arrest based on an outstanding

arrest warrant.  The Trooper then requested a K-9 unit.  The K-9 sniffed around

the exterior of Roberts' vehicle and alerted to it.  The next day, Detective Jim

Veltkamp applied for and was issued a search warrant for the car.  Two digital

scales, packaging materials, syringes, and approximately 42.8 grams of actual methamphetamine were seized from the vehicle.

On November 3, 2010, the United States charged Defendant Roberts by indictment with conspiracy to distribute methamphetamine, in violation of 21 U.S.C. § 846, five counts of distribution of methamphetamine, in violation of 21 U.S.C. § 841(a)(1), and one count of possession with intent to distribute methamphetamine, also in violation of 21 U.S.C. § 841(a)(1).

Now before the Court is Roberts' motion to suppress all physical evidence seized from the vehicle.  The motion is based on the premise that the K-9 alert should be excised from the search warrant application because (1) the stop was unlawfully prolonged as they waited for the K-9 to arrive and (2) the application did not establish the K-9's reliability.  Without the K-9 alert, Roberts insists (3) there was no probable cause justifying the issuance of the search warrant.  For the reasons that follow, the motion to suppress is denied.

## II.  Factual Background[1]

On the evening of June 24, 2010, Trooper Moore was monitoring eastbound

---

[1] The following facts are based on Trooper Moore's Notes, (dkt #15-1), the Application for Search Warrant, (dkt #15-2), the video of the stop and arrest incident as recorded by the Trooper's dashboard camera, (see dkt #16), and Trooper Moore, Detective Veltkamp and Deputy Peterson's testimony at the suppression hearing.

traffic on I-90.  Earlier that day, Detective Jim Veltkamp from the Missouri River

Drug Task Force informed Trooper Moore that Roberts' vehicle was in the area,

that there was an active warrant for his arrest, and that he might be transporting

narcotics.  Trooper Moore observed Roberts' vehicle and began to follow it.  The

car swerved within its lane and abruptly took the Logan exit off I-90.  The Trooper

followed.  As Roberts approached the end of the exit ramp, it appeared that he was

going to turn right, only to then turn left.  At the next intersection, the vehicle

failed to completely stop prior to the stop block.  At approximately 9:15 p.m.,[2] the

Trooper activated his lights.  Roberts passed two safe locations to pull over before

he came to a stop.

The Trooper approached the vehicle and told Roberts there was an active

warrant for the owner of the vehicle.  Roberts joked that it was not him.  The

Trooper observed that Roberts looked pale and his eyes were wide open.  The

Trooper asked why he was so nervous to which Roberts responded that it was due

to the outstanding warrant for his arrest.  The Trooper also commented on the

disheveled nature of the car's interior.

The Trooper requested Roberts' license, registration and insurance

information, and noticed that Roberts seemed flustered while looking for the

---

[2]All times are based on the time stamp from the dashboard camera's recording of the incident.

documents.  Roberts seemed abnormally nervous and said he would pay whatever he had to pay to avoid going to jail.  He also said the warrant was for a misdemeanor traffic violation.  When asked if he had any weapons, Roberts answered that he had a knife.  After searching him, the Trooper had Roberts join him in the police car.

While completing the paperwork for a traffic violation warning, the Trooper asked Roberts where he had been.  Roberts said he was returning from a three-day visit with his aunt in Spokane, Washington, and that he was unemployed and homeless.  Roberts also admitted to a criminal history involving drugs and "strong arm robbery."  The Trooper commented on the fact that Roberts was sweating, which Roberts denied.

Trooper Moore completed processing the warning and confirmed the warrant for Roberts' arrest was active.  Both men then exited the Trooper's vehicle.  The Trooper returned to Roberts his papers and issued him the warning. With his papers in hand, Roberts volunteered that he took the Logan exit off the freeway because he was stopping by a friend's house.  The Trooper then proceeded to ask Roberts additional questions about where he had been, his involvement with drugs, whether he had any drugs in the car, and whether he

would consent to a search of the vehicle.  Roberts again explained that he was

visiting his aunt in Spokane.  He denied having drugs in the car and withheld

consent for a search.  This additional questioning took approximately two and a

half minutes.  Just before 9:33 p.m., approximately eighteen minutes after the stop

was initiated, Trooper Moore placed Roberts under arrest based on the active

warrant.  Roberts was handcuffed and placed in the back of the Trooper's vehicle.

The Trooper then called for a K-9 unit to respond to the scene.

At approximately 9:50 p.m., Gallatin County Sheriff's Deputy Peterson (the

"K-9 Officer") arrived at the scene with his trained K-9, Noe.  Noe circled the

vehicle numerous times, at one point pawing the rear passenger-side door and later

crawling underneath that same door.  The K-9 Officer informed Trooper Moore

that Noe alerted to the vehicle.  The Trooper placed evidence tape on the vehicle,

and afterward drove Roberts to the detention center.

The next day Detective Veltkamp applied for a warrant to search Roberts'

vehicle.  The application described in detail the circumstances surrounding the

Trooper's stop of Roberts.  This included Roberts' driving behavior being

indicative of someone trying to avoid contact with law enforcement, the fact that

Roberts was very nervous despite knowing the active warrant was based on a

misdemeanor traffic violation, Roberts providing vague answers, and the facts that

-5-

he was unemployed, just took a short trip to Spokane, and had convictions for possession and distribution of drugs, as well as for robbery, theft, trespass and deceptive practices.

Additionally, the application described the K-9's alert to the vehicle.  In support, Detective Veltkamp asserted that the K-9 Officer is certified by the American Canine Trainers as a "Master Handler" of Noe, and that Noe is trained in the detection of marijuana, methamphetamine, heroin, cocaine, and all of their derivatives.  He also noted that the Missouri River Drug Task Force had received information that Roberts took frequent trips to obtain and transport drugs to the Bozeman area for distribution, and that on May 23, 2010 Bozeman police officers executed a search of Roberts' vehicle, resulting in the seizure of items connected to the activities of drug transportation and distribution.

On June 25, 2010, Montana District Court Judge Holly Brown authorized the search warrant, which was executed that same day.  Among other things, Detective Veltkamp seized two digital scales, packaging materials, syringes, and approximately 42.8 grams of methamphetamine.

## III.  Analysis

### A.    The Duration of the Stop

A seizure that begins lawfully may violate the Fourth Amendment "if its

manner or execution unreasonably infringes interests protected by the Constitution." Illinois v. Caballes, 543 U.S. 405, 407 (2005).  An initially legal traffic stop may become illegal if inquiries into matters unrelated to the justification for the stop unreasonably prolong it.  United States v. Turvin, 517 F.3d 1097, 1103-04 (9th Cir. 2008).  However, as long as the stop is not unreasonably extended, officers may ask questions unrelated to the purpose of the stop, even without reasonable suspicion for the questions.  United States v. Mendez, 476 F.3d 1077, 1081 (9th Cir. 2007).

Roberts argues his stop lasted nearly an hour as they waited for the K-9 unit. He thus insists the K-9 alert should be excised from the warrant application.  The government disputes that the stop was prolonged for the arrival of the dog considering the Trooper had placed Roberts under arrest prior to calling for the K-9 unit.  The government has it right.

The stop here lasted approximately 18 minutes, which concluded with Roberts being arrested.  Prior to the arrest, the Trooper reviewed Roberts' paperwork, searched him for weapons, ran a background check and issued him a warning for running through the stop sign.  The Trooper also asked Roberts about use and possession of drugs and whether he would consent to a search of the vehicle.  Roberts does not challenge the length of time it took to complete these

-7-

actions.  Nor does he challenge Trooper Moore's questioning as " 'appreciably' extend[ing] the duration" of the stop.  <u>Turvin</u>, 517 F.3d at 1102 (quoting <u>United States v. Stewart</u>, 473 F.3d 1265, 1269 (10th Cir. 2007)).  Roberts only contests the length of time between his arrest and the arrival of the K-9 unit, but that time was not part of the stop because he was no longer free to leave once arrested.  Moreover, even if Roberts contested the length of the stop rather than the time waiting while arrested, his argument would still fail.  The stop as a whole was reasonable, and Trooper Moore's questioning, which added "a minute or so" to the duration of the stop, did not make it otherwise.  <u>See id.</u> at 1103 (quoting <u>United States v. Childs</u>, 277 F.3d 947, 953 (7th Cir. 2002) (en banc)).

## B.    Reliability of the K-9

Next, Roberts argues the K-9 alert should be excised from the search warrant application because the application only provided information "that both the dog and the handler are trained" but no "information concerning [their] reliability."  Def.'s Br. 16.  In support, Roberts cites <u>United States v. Lingenfelter</u>, in which the Ninth Circuit noted "[a] canine sniff <u>alone</u> can supply the probable cause necessary for issuing a search warrant if the application for the warrant establishes the dog's reliability."  997 F.2d 632, 639 (9th Cir. 1993) (emphasis added).  Here, however, the dog sniff "alone" did not supply the probable cause.

Rather, it was one of numerous factors that in their totality did so.  Accordingly, the alert by a certified K-9 unit need not be excised from the search warrant even though the dog's reliability was not established.

## C.    Probable Cause and the Application for the Search Warrant

The culmination of Roberts' argument is that with the K-9 alert excluded the search warrant application did not contain probable cause.  As discussed above, the Court finds the alert need not be excised.  Regardless, even if the K-9 alert was omitted, the search warrant application still provided probable cause.

Under the Fourth Amendment, a warrant must be supported by probable cause.  Probable cause exists when there is a " 'fair probability' that contraband or evidence is located in a particular place.  Whether there is a fair probability depends upon the totality of the circumstances, including reasonable inferences, and is a 'commonsense, practical question.'  Neither certainty nor a preponderance of the evidence is required."  United States v. Kelley, 482 F.3d 1047, 1050 (9th Cir. 2007) (citations omitted).

Here, the search warrant application affirmed–not counting the K-9 alert–that Roberts' driving demonstrated a desire to avoid contact with an officer of the law, he was very nervous, he had a history of drug convictions, he had just completed a short trip and his car was in disarray, his answers to where he was and

-9-

for how long were vague, a search of his car the month before revealed evidence of drug transportation and distribution, and he seemed more concerned about the vehicle and its contents than the traffic violation and warrant for his arrest. Viewed in their totality, these circumstances provide probable cause.

## IV.  Conclusion

Because Roberts' stop was not unlawfully prolonged and the dog sniff was one of many factors that supported a finding of probable cause, the K-9 alert need not be excised from the search warrant application.  Even if it was, the search warrant application still contained probable cause justifying the search of Roberts' vehicle.

Accordingly, IT IS HEREBY ORDERED that Defendant Roberts' Motion to Suppress (dkt #14) is DENIED.

Dated this 16th day of March, 2011.

DONALD W. MOLLOY, DISTRICT JUDGE
UNITED STATES DISTRICT COURT